UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, RENA M.
SOKOLOW, JAMIE A. SOKOLOW,
LAUREN M. SOKOLOW, ELANA R.
SOKOLOW,

SHAYNA GOULD ELLIOTT, RONALD
ALLAN GOULD, ELISE JANET GOULD,
JESSICA RINE,

SHMUEL WALDMAN, HENNA NOVACK
WALDMAN, MORRIS WALDMAN, EVA
WALDMAN,

DR. ALAN J. BAUER, REVITAL BAUER,
YEHONATHON BAUER, BINYAMIN
BAUER, DANIEL BAUER, YEHUDA
BAUER,

RABBI LEONARD MANDELKORN,
SHAUL MANDELKORN, NURIT
MANDELKORN,

OZ JOSEPH GUETTA, VARDA GUETTA,

DIANNE COULTER MILLER, individually
and as personal representative of the Estate of
Janis Ruth Coulter, ROBERT L. COULTER,
JR., individually and as personal
representative of the Estate of Janis Ruth
Coulter, ANN MARIE K. COULTER, as
personal representative of the Estate of
ROBERT L. COULTER, SR.,

DR. LARRY CARTER, individually and as
personal representative of the Estate of Diane
Carter, SHAUN COFFEL,

Civil Action No.

**COMPLAINT**

**AND**

**JURY DEMAND**

DR. RICHARD BLUTSTEIN, individually and as personal representative of the Estate of Benjamin Blutstein, DR. KATHERINE BAKER, individually and as personal representative of the Estate of Benjamin Blutstein, REBEKAH BLUTSTEIN,

NEVENKA GRITZ, individually and as personal representative of the Estate of David Gritz, and as the sole successor to NORMAN GRITZ,

KAREN GOLDBERG, individually, as personal representative of the Estate of Stuart Scott Goldberg and as natural guardian of Plaintiff Tzvi Yehoshua Goldberg, CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, and TZVI YEHOSHUA GOLDBERG minor, by his next friend and guardian Karen Goldberg,

        Plaintiffs,

  v.

THE PALESTINE LIBERATION ORGANIZATION, and THE PALESTINIAN AUTHORITY (a/k/a "The Palestinian Interim Self-Government Authority" and "The Palestinian National Authority"),

        Defendants.

# COMPLAINT

## INTRODUCTION

1.     Defendants have blood on their hands.  Their officers and employees committed, admitted to, were convicted of, and are in prison for terrorist crimes of horrific violence.  Yet,

2

they remain on Defendants' payrolls, collecting generous salaries and promotions in rank while Defendants lionize them as national heroes. Defendants also pay the families of terrorists killed in terrorist attacks as a reward for their "sacrifice," and as a financial safety net for the terrorists' families, aimed at inducing and encouraging such attacks. Defendants incited, induced, directed, supported, orchestrated, executed, and then ratified the terrorist crimes for which the eleven American families before the Court seek justice.

2.      The al-Aqsa Intifada—otherwise known as the Second Intifada—began in 2000 and lasted until after Yasser Arafat died in 2004. Defendants recruited known terrorists into their "security" forces, armed them, and put them on their payroll. They released known terrorists from their jails. Through their official publications, television stations, and newspapers that they controlled, Defendants directed the members of their own security forces to commit acts of violence. They provided weapons, funding, safe houses, personnel, and other resources and support to terrorists and terrorist organizations. Lastly, they glorified and rewarded the perpetrators of violence with money, promotions, state-sponsored funerals, and media accolades.

3.      The purpose of this terror campaign was to intimidate and coerce the civilian population of Israel, to influence the policy of the U.S. and Israeli governments by intimidation or coercion, and to affect the conduct of the U.S. and Israeli governments by mass destruction. In short, they committed these crimes with the hope of ending the Israeli presence in the West Bank and Gaza Strip. It was a protection racket writ large: arrange for murder and mayhem resulting in the deaths and maiming of thousands of civilians, disingenuously condemn that violence, and then announce that the violence would end only if Israel withdrew from territory Defendants sought.

4.      Plaintiffs bring this civil action pursuant to the Antiterrorism Act and the Justice

Against Sponsors of Terrorism Act under 18 U.S.C. §§ 2331 and 2333, for money damages as compensation for injuries caused by a series of terrorist attacks carried out by Defendants between January 8, 2001 and January 29, 2004, in or near Jerusalem, Israel.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter and over Defendants pursuant to 18 U.S.C. §§ 2333 and 2334.

6.     The Court also has supplemental jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367 because they are related to, and form part of the same case or controversy as, the claims under which this Court has original jurisdiction.

7.     Venue is proper in the Southern District of New York pursuant to 18 U.S.C. § 2334(a) because one or more Plaintiffs reside in this district and Defendants Palestinian Authority and Palestine Liberation Organization maintain an office and agents in this District and can be found in this District.

## THE PARTIES

8.     Plaintiff MARK I. SOKOLOW was severely harmed by a terrorist bombing planned and carried out by Defendants on January 27, 2002, in Jerusalem, Israel (hereinafter: "the January 27, 2002 bombing"), and is, and at all times relevant hereto was, an American citizen.

9.     Plaintiff RENA M. SOKOLOW was severely harmed by the January 27, 2002 bombing, and is, and at all times relevant hereto was, an American citizen.

10.     Plaintiff JAMIE A. SOKOLOW was severely harmed by the January 27, 2002 bombing, and is, and at all times relevant hereto was, an American citizen.

11.     Plaintiff LAUREN M. SOKOLOW was severely harmed by the January 27, 2002

bombing, and is, and at all times relevant hereto was, an American citizen.

12.    Plaintiff ELANA R. SOKOLOW was severely harmed by the January 27, 2002 bombing, and is, and at all times relevant hereto was, an American citizen and the daughter of Plaintiffs MARK I. SOKOLOW and RENA M. SOKOLOW and the sister of Plaintiffs LAUREN M. SOKOLOW and JAMIE A. SOKOLOW.

13.    Plaintiff SHAYNA GOULD ELLIOTT (hereinafter: "SHAYNA GOULD") was severely harmed by a terrorist shooting attack planned and carried out by Defendants on January 22, 2002, in Jerusalem, Israel (hereinafter: "the January 22, 2002 shooting attack"), and is, and at all times relevant hereto was, an American citizen.

14.    Plaintiff RONALD ALLAN GOULD (hereinafter: "RONALD GOULD") was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, an American citizen and the father of Plaintiff SHAYNA GOULD.

15.    Plaintiff ELISE JANET GOULD (hereinafter: "ELISE GOULD") was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, an American citizen and the mother of Plaintiff SHAYNA GOULD.

16.    Plaintiff JESSICA RINE was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, an American citizen and the sister of Plaintiff SHAYNA GOULD.

17.    Plaintiff SHMUEL WALDMAN was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, an American citizen.

18.    Plaintiff HENNA NOVACK WALDMAN (hereinafter: "HENNA WALDMAN") was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, an American citizen and the wife of Plaintiff SHMUEL WALDMAN.

19.     Plaintiff MORRIS WALDMAN was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, an American citizen and the father of Plaintiff SHMUEL WALDMAN.

20.     Plaintiff EVA WALDMAN was severely harmed by the January 22, 2002 shooting attack and is, and at all times relevant hereto was, the mother of Plaintiff SHMUEL WALDMAN.

21.     Plaintiff DR. ALAN J. BAUER was severely harmed by a terrorist bombing planned and carried out by Defendants on March 21, 2002, in Jerusalem, Israel ("the March 21, 2002 bombing"), and is, and at all times relevant hereto was, an American citizen.

22.     Plaintiff YEHONATHON BAUER was severely harmed by the March 21, 2002 bombing, and is, and at all times relevant hereto was, an American citizen.

23.     Plaintiff REVITAL BAUER was severely harmed by the March 21, 2002 bombing, and is, and at all times relevant hereto was, the wife of Plaintiff DR. ALAN J. BAUER and mother of YEHONATHON BAUER.

24.     Plaintiff BINYAMIN BAUER was severely harmed by the March 21, 2002 bombing, and is, and at all times relevant hereto was, an American citizen, the son of Plaintiff DR. ALAN J. BAUER, and brother of YEHONATHON BAUER.

25.     Plaintiff DANIEL BAUER was severely harmed by the March 21, 2002 bombing, and is, and at all times relevant hereto was, an American citizen, the son of Plaintiff DR. ALAN J. BAUER, and brother of YEHONATHON BAUER.

26.     Plaintiff YEHUDA BAUER was severely harmed by the March 21, 2002 bombing, and is, and at all times relevant hereto was, an American citizen, the son of Plaintiff DR. ALAN J. BAUER, and brother of YEHONATHON BAUER.

27.    Plaintiff RABBI LEONARD MANDELKORN was severely harmed by a terrorist bombing planned and carried out by Defendants on June 19, 2002, in Jerusalem, Israel ("the June 19, 2002 bombing"), and is, and at all times relevant hereto was, an American citizen and the father of Plaintiff SHAUL MANDELKORN.

28.    Plaintiff SHAUL MANDELKORN was severely harmed by the June 19, 2002 bombing, and is, and at all times relevant hereto was, the son of Plaintiffs RABBI LEONARD MANDELKORN and NURIT MANDELKORN.

29.    Plaintiff NURIT MANDELKORN was severely harmed by the June 19, 2002 bombing, and is, and at all times relevant hereto was, the mother of Plaintiff SHAUL MANDELKORN.

30.    Plaintiff OZ JOSEPH GUETTA was severely harmed by a terrorist shooting attack planned and carried out by Defendants on January 8, 2001, near Jerusalem, Israel ("the January 8, 2001 shooting attack"), and is, and at all times relevant hereto was, an American citizen.

31.    Plaintiff VARDA GUETTA was severely harmed by the January 8, 2001 shooting attack, and is, and at all times relevant hereto was, the mother of Plaintiff OZ JOSEPH GUETTA.

32.    Plaintiff DIANNE COULTER MILLER was severely harmed by a terrorist bombing planned and carried out by Defendants' co-conspirators, and which was facilitated and caused by material support and resources provided by Defendants, on July 31, 2002, in Jerusalem, Israel ("the July 31, 2002 bombing"), and is, and at all times relevant hereto was, an American citizen.  Plaintiff DIANNE COULTER MILLER is the sister of decedent Janis Ruth Coulter, an American citizen who was murdered in the July 31, 2002 bombing, and brings this

action individually and as personal representative of the Estate of Janis Ruth Coulter.

33.     Plaintiff ROBERT L. COULTER, JR. was severely harmed by the July 31, 2002 bombing, and is, and at all times relevant hereto was, an American citizen and the brother of decedent Janis Ruth Coulter.  Plaintiff ROBERT L. COULTER, JR. brings this action individually and as personal representative of the Estate of Janis Ruth Coulter.

34.     Plaintiff ANN MARIE K. COULTER is the personal representative of the estate of her late husband, ROBERT L. COULTER, SR., who died on November 26, 2018.  ROBERT L. COULTER, SR. was severely harmed by the July 31, 2002 bombing, was at all times relevant hereto an American citizen and was the father of decedent Janis Ruth Coulter.  Plaintiff ANN MARIE K. COULTER brings this action as the personal representative of the Estate of ROBERT L. COULTER, SR.

35.     Plaintiff DR. LARRY CARTER was severely harmed by the July 31, 2002 bombing, and is, and at all times relevant hereto was, an American citizen and the father of Dianne ("Dina") Carter sister of decedent Janis Diane ("Dina") Carter, an American citizen who was murdered in the July 31, 2002 bombing. Plaintiff DR. LARRY CARTER brings this action individually and as the personal representative of the Estate of Diane ("Dina") Carter.

36.     Plaintiff SHAUN COFFEL was severely harmed by the July 31, 2002 bombing, and is, and at all times relevant hereto was, an American citizen and the sister of decedent Diane ("Dina") Carter.

37.     Plaintiff DR. RICHARD BLUTSTEIN was severely harmed by the July 31, 2002 bombing, and is, and at all times relevant hereto was, an American citizen.  Plaintiff DR. RICHARD BLUTSTEIN is the father of American citizen Benjamin Blutstein, who was murdered in the July 31, 2002 bombing, and brings this action individually and as the personal

8

representative of the Estate of Benjamin Blutstein.

38.     Plaintiff DR. KATHERINE BAKER was severely harmed by the July 31, 2002 bombing, and is, and at all times relevant hereto was, an American citizen.  Plaintiff DR. KATHERINE BAKER is the mother of American citizen Benjamin Blutstein, who was murdered in the July 31, 2002 bombing, and brings this action individually and as the personal representative of the Estate of Benjamin Blutstein.

39.     Plaintiff REBEKAH BLUTSTEIN was severely harmed by the July 31, 2002 bombing, and is, and at all times relevant hereto was, an American citizen and the sister of decedent Benjamin Blutstein.

40.     Plaintiff NEVENKA GRITZ was severely harmed by the July 31, 2002 bombing. Plaintiff NEVENKA GRITZ is the mother of American citizen David Gritz, who was murdered in the July 31, 2002 bombing, and brings this action individually, as the personal representative of the Estate of David Gritz, and as the sole successor to NORMAN GRITZ.  NORMAN GRITZ was severely harmed by the July 31, 2002 bombing.  He was at all times relevant hereto an American citizen and the father of decedent David Gritz.  NORMAN GRITZ died on September 7, 2005, leaving NEVENKA GRITZ as his sole heir.

41.     Plaintiff KAREN GOLDBERG was severely harmed by a terrorist bombing planned and carried out by Defendants on January 29, 2004, in Jerusalem, Israel ("the January 29, 2004 bombing"), and is, and at all times relevant hereto was, an American citizen.  Plaintiff KAREN GOLDBERG is the widow of Stuart Scott Goldberg, who was murdered in the January 29, 2004 bombing, and she brings this action individually, as the personal representative of the Estate of Stuart Scott Goldberg, and as natural guardian of her minor child Tzvi Yehoshua Goldberg.

42.     Plaintiff CHANA BRACHA GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the daughter of decedent Stuart Scott Goldberg.

43.     Plaintiff ESTHER ZAHAVA GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the daughter of decedent Stuart Scott Goldberg.

44.     Plaintiff YITZHAK SHALOM GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the son of decedent Stuart Scott Goldberg.

45.     Plaintiff SHOSHANA MALKA GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the daughter of decedent Stuart Scott Goldberg.

46.     Plaintiff ELIEZER SIMCHA GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the son of decedent Stuart Scott Goldberg.

47.     Plaintiff YAAKOV MOSHE GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the son of decedent Stuart Scott Goldberg.

48.     Plaintiff TZVI YEHOSHUA GOLDBERG was severely harmed by the January 29, 2004 bombing, and is, and at all times relevant hereto was, an American citizen and the minor son of Plaintiff KAREN GOLDBERG and decedent Stuart Scott Goldberg.

49.     Defendant THE PALESTINE LIBERATION ORGANIZATION (hereinafter "PLO") is and at all times relevant hereto was, a legal person as defined in 18 U.S.C. § 2331(3) ,

in *de jure* and *de facto* control of Defendant Palestinian Authority, and its agencies and instrumentalities, by virtue of being party to and beneficiary of the international instruments by which Defendant Palestinian Authority was established.

50. Defendant THE PALESTINIAN AUTHORITY, also known as The Palestinian Interim Self-Government Authority and/or The Palestinian National Authority (hereinafter "PA") is and at all times relevant hereto was, a legal person as defined in 18 U.S.C. § 2331(3).

51. At all relevant times, the PLO and PA have had offices and agents in the United States.

52. At all relevant times, the PLO and PA have received U.S. foreign assistance under section 481 and chapters 4 and 9 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. § 2346 et seq.). As of the date of the filing of this complaint, such U.S. assistance continues.

## STATEMENT OF FACTS

53. Since its establishment in the 1960's, defendant PLO has funded, planned and carried out thousands of terrorist bombings and shootings, resulting in the deaths of hundreds of innocent civilians and the wounding of thousands more. Dozens of United States citizens were murdered, and many more wounded, by terrorist attacks carried out by defendant PLO.

54. Congress explicitly found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad." 22 U.S.C. § 5201. At all relevant times, defendant PLO carried out and utilized these terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals.

55. Since its establishment in 1994, defendant PA has also planned and carried out thousands of terrorist bombings and shootings, resulting in the deaths of thousands of civilians

and the wounding of thousands more.  Many United States citizens were murdered, and many more wounded, by terrorist attacks carried out by defendant PA.  At all relevant times, defendant PA implemented and utilized these terrorist attacks against civilians through their officials, agents, and employees as an established and systematic policy and practice to advance and achieve its political goals.

56.    Defendants organized their agents and employees into various specially-trained units and cells, which planed and executed terrorist attacks on behalf of and for the PLO and PA. These terrorist units and cells were Defendants' agents, instrumentalities, agencies, organs and/or alter egos, wholly funded and controlled by them (collectively hereinafter: "terrorist units").  At all relevant times, these terrorist units planned and carried out terrorist attacks on Defendants' behalf under various names, including the Palestine National Liberation Movement ("Fatah"), Tanzim, Fatah-Tanzim, al-Aqsa Martyrs Brigades ("AAMB"), and Martyrs of Al Aqsa.

57.    At all relevant times, as will be further described below and proven at trial, Defendants and their terrorist units, officials, agents, and employees agreed and conspired with one another to carry out acts of international terrorism (within the meaning of 18 U.S.C. § 2331), and knowingly aided, abetted, funded and provided a wide range of weapons and other substantial material support and resources to terrorists and to U.S-designated Foreign Terrorist Organizations ("FTOs") for the execution of acts of international terrorism, all with the specific intention of funding, causing and facilitating the commission of acts of international terrorism.

58.    Defendants and Fatah were alter egos of one another.  Defendants acted in functional unison, controlled at all relevant times by one man—Yasser Arafat.  From 1959 until his death in 2004, Yasser Arafat commanded Fatah.  He was also the Chairman of the PLO from 1969 to 2004, and the President of the PA from 1994 to 2004.  Through these positions, Arafat

functionally retained exclusive day-to-day control over the Palestinian security forces until his death.

59.     Arafat controlled the day-to-day operations and the budgets of all three entities, and controlled their activities. Fatah members held leadership positions in the PA, the PA answered to the PLO, and all three reported to Arafat. Arafat personally controlled the spending and operations of each of the PA, PLO, and Fatah. He treated each of these three entities' assets as his own. He controlled personnel decisions in all three entities. None of the three entities dealt at arm's length with the others. The PA was the only source of revenue for the PLO.

60.     At the beginning of the al-Aqsa Intifada, Fatah operatives, many of whom were employed in the PA's security apparatus, initiated terrorist activity against civilian targets on the direction of Defendants. To that end, Fatah's AAMB were intended to serve as the Fatah's military wing for carrying out terrorists attacks against Israel. The AAMB were also under Arafat's control.

61.     At all relevant times, Marwan Barghouti led Fatah's military operations in the West Bank. Barghouti reported directly to Arafat, and his lieutenants included Nasser Aweis, Ahmed Barghouti (his bodyguard and driver), Mohammed Mousleh, and Nasser Shawish, each of whom was convicted of perpetrating one or more of the attacks that caused Plaintiffs' injuries. Marwan Barghouti was the public face of the al-Aqsa Intifada, inciting, threatening, boasting, and praising terror attacks on television and in media outlets that included the Washington Post. He is, and at all relevant times was, an employee and/or agent and/or coconspirator of the PLO and the PA.

62.     Through media outlets owned and controlled by the PA, and through speeches by PA and PLO officials, Defendants directed, authorized, and incited terrorist violence against

Israeli civilians.

63.     Most important were magazines published for PA police and security forces—published by the PA, edited and authored in many cases by the PA's and the PLO's so-called "Political Guidance" apparatus, and distributed to security and police personnel.  This "Political Guidance" apparatus had representatives in all PA security forces; its job being to "educate" PA security personnel by delegitimizing the existence of the State of Israel and to encourage terrorist-attacks.

64.     Furthermore, PA TV—which Defendants owned and controlled—broadcast programs in which children expressed their wish to engage in "shahada" (suicide martyrdom) because shahada was "beautiful."  Moreover, Arafat appeared in public with his machine gun and made public speeches encouraging violence—including a notorious one to a group of children in which he glorified a child who committed suicide and then led the children in a chant of "a million martyrs marching to Jerusalem."  Programming on PA TV encouraged viewers to "Kill the Jews, and the Americans who are just like them."

65.     In all, Defendants glorified the acts of terrorists, including those who injured Plaintiffs and murdered their decedents, portraying them as national heroes through state-sponsored funerals and television programs honoring their "sacrifices."

66.     Because of Defendants' pro-terror policies during the al-Aqsa Intifada, hundreds of the PA's security and police employees are in jail in Israel, having been convicted of terrorist crimes during that period—as Defendants' own officials and websites proudly confirm.  Many other PA security and police employees were killed while carrying out terrorist attacks.  Among these were more than a dozen of Defendants' employees who participated in the attacks at issue here.

14

67.     During the period relevant hereto, the President of the United States, the U.S. State Department, special U.S. envoys, the Congress of the United States and others repeatedly demanded from the PA and PLO that they take effective measures to prevent terrorist attacks by the AAMB, Hamas, and other terrorist organizations and groups operating within the territories controlled by the PLO and PA.

68.     The PLO and PA refused and/or ignored American demands.  On the contrary, at all relevant times, Defendants PLO and PA, by and through their officials, employees and agents acting within the scope and course of their employment and agency, pursuant to authorization and instructions of Arafat and others agents and employees of the PLO and PA, provided the AAMB, Hamas and other terrorists with material support and resources in the form of weapons, personnel, safe harbor, training, funding, communications equipment and other material support for their terrorist activities and further provided the terrorists with safe haven and a base of operations, by permitting and/or encouraging the AAMB, Hamas, and other terror groups to operate freely and conduct activities in the territory under their control or in which they maintained a police presence, and to advocate, encourage, solicit, facilitate, incite for, sponsor, organize, plan and execute acts of violence, murder and terrorism against innocent civilians in Israel, including in locations known to be frequented by Americans.

69.     Contemporaneously with their terror campaign in Israel, the PLO and PA launched an extensive influence campaign to use that terror campaign to manipulate the U.S. government into pressuring the Israeli government into accommodating the PA/PLO political goals.  This influence campaign was expressly directed at the society and government of the United States.  For example, between 2000 and 2002, Hasan Abdel Rahman, the Chief Representative of the PLO and PA in the U.S. at the time, repeatedly argued to U.S. leaders and

the American public that the only way the terrorist attacks in Israel would end was if the U.S. pressured Israel to withdraw from the contested territories. A small sampling of his statements demonstrates the linkage made between the terrorist attacks and the need for change in U.S. policy.  He appeared on CNN on April 12, 2002 and stated:  "one of the most brutal occupations in modern history.  That's what turns people into suicide bombers."  He appeared on PBS, on March 29, 2002 and stated: "Mr. Colin Powell is missing the point . . . He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories . . . if the occupation continues . . . no one can stop the Palestinians."

70.    He made other appearances on national TV in the U.S.:  on CNN February 3, 2002,  he stated "[t]he Jewish settlements . . . have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel."); and on CNN, April 14, 2002, he stated: "I think the involvement of the United States on the site would be very, very helpful because obviously the two parties trust the United States and they want the United States to be involved . . . We feel that 35 years of foreign, illegal occupation is more than enough."

71.    Similarly, Marwan Barghouti published an op-ed piece in the *Washington Post* in January 2002 entitled "Want Security?  End the Occupation."  This was at the very same time that Marwan Barghouti was orchestrating terror attacks in Israel.

72.    The PLO and PA secretly supported acts of terrorism which killed and injured many Americans all the while pressuring the U.S. government, under false pretenses, to act on its behalf.  The PLO and PA attempt to influence the United States depended on continued terror attacks in Israel, which were being orchestrated by Defendants at the same time.  The U.S.-media campaign, directed to the society and government of the United States, formed an element of the liability-creating conduct because they revealed Defendants' apparent intent to influence the

16

government and policy of the United States through acts of violence.

**The January 8, 2001 Shooting**

73.     On January 8, 2001, four men armed with machine guns opened fire on Plaintiffs VARDA GUETTA and OZ JOSEPH GUETTA as they drove on a road north of Jerusalem.

74.     Several bullets struck Plaintiff OZ JOSEPH GUETTA, then 12 years old, and as a direct and proximate result, he suffered severe physical, emotional, mental and economic harm and injuries.

75.     Plaintiff VARDA GUETTA, who was driving the car, suffered severe emotional, mental and economic harm and injuries as a direct and proximate result of the machine-gun attack.

76.     In 2000 and 2001, members of PA Presidential Security (a/k/a "Force 17"), the elite PA paramilitary unit responsible for protecting Yasser Arafat himself—perpetrated a series of shooting attacks against Jewish civilians on roads north of Jerusalem.  Those attacks contained specific tactics and characteristics that also existed in the attack against Plaintiffs OZ JOSEPH GUETTA and VARDA GUETTA.

77.     Sufficient circumstantial evidence exists to show that the four gunmen acted as Defendants' agents and employees and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance of the goals and policies of Defendants PLO and PA, and using funds, weapons, means of transportation and communication and other material support and resources supplied by Defendants PLO and PA for the express purpose of carrying out this attack and terrorist attacks of this type.

78.     Defendants PLO and PA agreed, conspired and acted in concert with the four

gunmen to carry out the January 8, 2001 terrorist shooting, knowingly provided substantial assistance to them, and aided and abetted them to carry out that shooting.

**The January 22, 2002 Shooting**

79.     Prior to January 22, 2002, acting pursuant to Defendants' authorization, instructions, solicitation and directives, and within the scope of their agency and employment, Said Ramadan, Ahmed Barghouti, Nasser Aweis, Majed Al-Masri, Ibrahim Abdel Hai, Fares Ghanem, Mohamed Sami Abdullah, Mohammed Mousleh, and others jointly planned, agreed, conspired and made preparations to murder and injure innocent persons by means of a machine-gun attack on innocent passersby in downtown Jerusalem, Israel.

80.     Said Ramadan was at all relevant times PA Maritime Police officer.  He died perpetrating the January 22, 2002 Shooting.

81.     Ahmed Barghouti, a sergeant in the PA's Civil Police Force, was head of Fatah's AAMB in the West Bank town of Ramallah.  He was the driver and bodyguard of Marwan Barghouti, the head of Fatah's military operations in the West Bank, public face of the al-Aqsa Intifada, and direct report of Arafat.  Ahmed Barghouti is, and at all relevant times was, an employee and agent of the PLO and the PA.

82.     Nasser Aweis, a captain in the PA's National Security Forces, had a long history of security offenses and was on the so-called "Zinni List" of most-wanted terrorists (presented to Arafat by U.S. envoy Anthony Zinni in December 2001).  He is, and at all relevant times was, an employee and agent of the PLO and the PA.

83.     Mohamed Mousleh (an employee of the PA's Legislative Council), Majed al-Masri (a captain in the PA Civil Police), Ibrahim Abdel Hai (an officer in the PA Maritime Police Force), Fares Ghanem, and Mohamed Abdullah are, and at all relevant times were,

employees and/or agents of the PLO and the PA.

84.     On January 22, 2002, Said Ramadan, arrived at Jaffa Street near the corner of Rav Kook Street in downtown Jerusalem, to murder and injure innocent pedestrians with an assault rifle that Defendants provided him.

85.     At approximately 4:20 PM on January 22, 2002, Ramadan screamed "Allahu Akbar" ("Allah is great"), before opening fire on civilians boarding a public bus on Jaffa Street at the corner of Rav Kook Street, with the intention of murdering or injuring as many as possible. After spraying the boarding passengers with bullets, he walked down Jaffa Street, shooting scores of civilians with an assault rifle.

86.     Two elderly women were killed in the January 22, 2002 shooting attack, and over 45 innocent pedestrians were shot or suffered other physical injures, including Plaintiffs SHAYNA GOULD and SHMUEL WALDMAN.

87.     Plaintiffs SHAYNA GOULD and SHMUEL WALDMAN suffered severe physical, emotional, mental and economic harm, and injuries as a direct and proximate result of the January 22, 2002 shooting attack.

88.     Plaintiffs RONALD GOULD, ELISE GOULD, JESSICA RINE, HENNA WALDMAN, MORRIS WALDMAN and EVA WALDMAN suffered severe emotional, mental and economic harm, and injuries as a direct and proximate result of the January 22, 2002 shooting attack.

89.     Ahmed Barghouti and Nasser Aweis were convicted as the attack's primary architects.  Mohamed Mousleh, Majed Al-Masri, Ibrahim Abdel Hai, Fares Ghanem, and Mohamed Abdullah were also convicted for their roles in the attack.

90.     Defendant PA continues to employ and promote the five surviving employees, as

well as Fares Ghanem and Mohamed Abdullah, while they sit in jail.  Defendants' intelligence files commend Ahmed Barghouti and others as "good in terms of security and morals."

91.    As for the shooter, Said Ramadan, who died in the attack, defendant PA posthumously promoted him and officially designated him an "al-Aqsa Martyr," giving his family monthly payments because he was "martyred while performing his national duty."

92.    Defendants also honored the perpetrators in PA-controlled media outlets.

93.    The AAMB, in conspiracy with and materially supported by Defendants, committed, planned, and/or authorized the shooting.  Ramadan was a member of the AAMB, at all relevant times acting at the behest, instruction, and/or authorization of the AAMB.  His "martyr's video," shot shortly before his suicide terrorist attack, shows Ramadan wearing an AAMB headband and holding the assault rifle used to perpetrate his crimes.

94.    The shooting attack on January 22, 2002 was planned and carried out by Ahmed Barghouti, Nasser Aweis, Majed Al-Masri, Ibrahim Abdel Hai, Mohamed Mousleh, Fares Ghanem, Mohamed Abdullah, Said Ramadan, the AAMB, and others acting as Defendants' agents and employees and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance Defendants' goals and policies, and using personnel, funds, weapons, means of transportation and other material support and resources that Defendants supplied them, for the express purpose of carrying out this attack and terrorist attacks of this type.

95.    Defendants agreed, conspired and acted in concert with Ahmed Barghouti, Nasser Aweis, Majed Al-Masri, Ibrahim Abdel Hai, Mohamed Mousleh, Fares Ghanem, Mohamed Sami Abdullah, Said Ramadan and the AAMB to carry out the January 22, 2002 terrorist shooting, knowingly provided substantial assistance to them, aided and abetted them to carry out

that shooting, and authorized, ratified and participated in that shooting.

**The January 27, 2002 Bombing**

96.    Prior to January 27, 2002, acting pursuant Defendants' authorization, instructions, solicitation and directives, and within the scope of their agency and employment, Munzar Noor, Wafa Idris, and Kamal Al Abed (a/k/a "Mohamed Mukhtasab" a/k/a "Abu Talal") jointly planned, agreed, conspired and made preparations to murder and injure innocent persons by means of a bombing attack on innocent pedestrians in downtown Jerusalem, Israel.

97.    The bombing was primarily planned by Abu Talal, a lieutenant, at the time, in the PA's Military Intelligence unit.

98.    Abu Talal asked an informant he knew, Munzar Noor, for a woman to carry out an attack.  Noor suggested Wafa Idris, a Fatah "activist" and informant to the PA Military Intelligence service.

99.    When Idris balked, according to Noor, "[i]n the home of Abu Talal, we sat down, Abu Talal and Wafa Idris and I, and we talked about the subject; I mean a suicide attack [by Idris]."  Abu Talal then gave Idris the bomb and instructions.

100.    Accordingly, on January 27, 2002, at midday, Wafa Idris arrived at Jaffa Street in downtown Jerusalem, to murder and injure innocent passersby with a powerful explosive device that Defendants provided her with for this specific purpose.  She then detonated the explosive device shortly before 12:30 P.M., causing a massive explosion.

101.    An 81 year-old man was killed in the explosion, and over 150 persons were wounded, including Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW and LAUREN M. SOKOLOW, who were present on the street at the time of the explosion and in close proximity to Wafa Idris.  They suffered severe burns, shrapnel wounds,

fractures and other serious injuries as a result of the explosion.

102.    Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW and LAUREN M. SOKOLOW suffered severe physical, emotional, mental and economic harm and injuries as a direct and proximate result of the January 27, 2002 bombing attack.

103.    Plaintiff ELANA R. SOKOLOW suffered severe emotional, mental and economic harm and injuries as a direct and proximate result of the January 27, 2002 bombing attack.

104.    Defendant PA's intelligence service knew of the bombing in advance: on the day of the bombing, even before Idris's identity was released, Tawfiq Tirawi, the head of the PA's General Intelligence Service ("GIS"), asked Idris's family to delay disclosing her identity.

105.    Defendants made Idris a national hero because she was the first female suicide bomber to attack Israeli civilians.  Defendants officially recognized her as an "al-Aqsa martyr," described her as "martyred during a heroic martyrdom operation against the Zionists in the occupied city of Jerusalem," and provided her family with a monthly stipend.

106.    Munzar Noor is serving a life sentence.  Defendants deem his imprisonment "a result of his fight for his country" and make monthly payments to his family.  Abu Talal received safe haven in Arafat's headquarters and, after the attack, was promoted to Major.

107.    The AAMB, in conspiracy with and materially supported by Defendants, committed, planned, and/or authorized the bombing.  Idris was a member of the AAMB, at all relevant times acting at the behest, instruction, and/or authorization of the AAMB.  Marwan Barghouti, public face of the al-Aqsa Intifada, commander of Fatah's military operations in the West Bank, and direct report of Arafat, attended Idris's funeral and told the press that her attack reflected the strategy of "the Fatah movement."

108.    The bombing attack on January 27, 2002 was planned and carried out by Munzar

Noor, Wafa Idris, Abu Talal, and the AAMB acting as agents and employees of the PLO and PA and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance of Defendants' goals and policies, and using personnel, funds, weapons, communication equipment, and other material support and resources that Defendants supplied them for the express purpose of carrying out this attack and terrorist attacks of this type.

109.    Defendants agreed, conspired and acted in concert with Munzar Noor, Wafa Idris, Abu Talal and the AAMB to carry out the January 27, 2002 terrorist bombing, knowingly provided substantial assistance to them, aided and abetted them to carry out that bombing, and authorized, ratified and participated in that bombing.

**The March 21, 2002 Bombing**

110.    Prior to March 21, 2002, acting pursuant to Defendants' authorization, instructions, solicitation and directives, and within the scope of their agency and employment, Mohammed Hashaika, Nasser Shawish, Abdel Karim Aweis, Qahira Al-Sa'adi, and Sana'a Shehadeh jointly planned, agreed, conspired and made preparations to murder and injure innocent persons by means of a bombing attack on innocent passersby in downtown Jerusalem, Israel.

111.    Accordingly, on March 21, 2002, at approximately 4:15 PM, Hashaika arrived at King George Street in downtown Jerusalem, in order to murder and injure innocent passersby by means of a powerful explosive device with which he was provided for this specific purpose by Defendants.  Hashaika detonated the explosive at approximately 4:20 PM, causing a massive explosion.

112.    Three innocent pedestrians were killed in the explosion, and over 81 more were

wounded.  Plaintiffs DR. ALAN J. BAUER and YEHONATHON BAUER, who were present on the street at the time of the explosion and in close proximity to Hashaika, suffered severe burns, shrapnel wounds, fractures and other serious injuries as a result of the explosion.

113.    Plaintiffs DR. ALAN J. BAUER and YEHONATHON BAUER suffered severe physical, emotional, mental and economic harm and injuries as a direct and proximate result of the March 21, 2002 bombing attack.

114.    Plaintiffs REVITAL BAUER, BINYAMIN BAUER, DANIEL BAUER and YEHUDA BAUER suffered severe emotional, mental and economic harm and injuries as a direct and proximate result of the March 21, 2002 bombing attack.

115.    Hashaika was a former PA police officer and member of Fatah's AAMB, and participated in many terrorist operations.  Before the attack, he and Nasser Shawish (another perpetrator of the bombing) were arrested by the PA police for attempting "to perpetrate a suicide operation."

116.    Yasser Arafat was personally informed of their arrest and interrogation by Tawfiq Tirawi, head of the PA's General Intelligence Service.  At the request of Abdel Karim Aweis, the PA released Hashaika and Shawish just a few weeks later.  Hashaika then perpetrated the attack shortly after his release, under the guidance of Abdel Karim Aweis and with Shawish's assistance.

117.    While Shawish was a fugitive in the weeks before the bombing, he received funds approved by Arafat himself.  After the attack, Defendants glorified Hashaika for "executing a martyrdom operation in West Jerusalem" that "led to the killing and injury of a large number of Israelis," and described him as "one of the Palestinian revolution's martyrs."

118.    Defendants awarded Hashaika's family a monthly stipend and honored him as an

"al-Aqsa Martyr."

119.    Abdel Karim Aweis, a Lieutenant in the PA's GIS and a senior member of Fatah's AAMB, planned the attack.  He had earlier been convicted of murdering a Palestinian he suspected of being an informant, but he was released by Israel at the request of Defendant PLO in connection with peace talks, and Defendant PA hired him as an armed security officer.

120.    Like Nasser Aweis (who was convicted of the January 22, 2002 attack), Abdel Karim Aweis was one of the 33 most wanted terrorists on the Zinni List.

121.    The day before the March 21 attack, Abdel Karim Aweis met Marwan Barghouti to discuss the plan and received money for the attack from Marwan Barghouti.  Abdel Karim Aweis also received money and weapons from Fatah leader Hussein Al Sheikh.  He plead guilty to murder charges for his role in the attack.

122.    Defendants have kept Abdel Karim Aweis on the PA payroll since the attack and have promoted him at least four times.  Defendants honored other individuals convicted for the attack, including Shawish, in PA-owned and controlled media outlets.

123.    Sana'a Shehadeh is, and at all relevant times was, an agent of the PLO and the PA.

124.    Qahira Al-Sa'adi is, and at all relevant times was, an agent of the PLO and the PA.

125.    The AAMB, in conspiracy with and materially supported by Defendants, committed, planned, and/or authorized the bombing.  Marwan Barghouti and Abdel Karim Aweis were two of the senior-most leaders of the AAMB.  Defendants' own documents show that the March 21, 2002 bombing was an AAMB attack.

126.    The March 21, 2002 bombing attack was planned and carried out by Mohamed Hashaika, Nasser Shawish, Abdel Karim Aweis, Qahira Al-Sa'adi, Sana'a Shehadeh and the

AAMB acting as Defendants' agents and employees and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance of Defendants' goals and policies, and using personnel, funds, weapons, means of transportation and communication and other material support and resources that Defendants supplied them for the express purpose of carrying out this attack and terrorist attacks of this type.

127.    Defendants conspired, agreed and acted in concert with Mohamed Hashaika, Nasser Shawish, Abdel Karim Aweis, Qahira Al-Sa'adi, Sana'a Shehadeh and the AAMB to carry out the March 21, 2002 bombing attack, knowingly provided substantial assistance to them, aided and abetted them to carry out that bombing, and authorized, ratified and participated in that bombing.

**The June 19, 2002 Bombing**

128.    Prior to June 19, 2002, acting pursuant to Defendants' authorization, instructions, solicitation and directives, and within the scope of their agency and employment, Sa'id Awada, Naef Abu Sharkh, and other co-conspirators jointly planned, agreed, conspired and made preparations to murder and injure innocent persons by means of a bombing attack on innocent passersby in Jerusalem, Israel.

129.    Accordingly, on June 19, 2002, at approximately 7:00 PM, Sa'id Awada arrived at a crowded bus stop at the French Hill intersection in northern Jerusalem, in order to murder and injure innocent passersby by means of a powerful explosive device which he was provided for this specific purpose by agents of Defendants.  He detonated the explosive at approximately 7:00 PM, causing a massive explosion.

130.    Seven innocent persons were killed in the explosion, and 35 more were wounded.

Plaintiff SHAUL MANDELKORN was present at the site of the bombing and in close proximity to the bomber, and suffered severe bums, shrapnel wounds and other serious injuries as a result of the explosion.

131.    Plaintiff SHAUL MANDELKORN suffered severe physical, emotional, mental and economic harm and injuries as a direct and proximate result of the June 19, 2002 bombing attack.

132.    Plaintiffs RABBI LEONARD MANDELKORN and NURIT MANDELKORN suffered severe emotional, mental and economic harm and injuries as a direct and proximate result of the June 19, 2002 bombing attack.

133.    Awada was, at the relevant time, an AAMB member.  Defendants' records state that Awada "was martyred while executing a martyrdom operation in Jerusalem [which] led to the death and injury of a large number of Zionists."  Defendants officially designated Awada an "al-Aqsa martyr" and began making monthly payments to his family.

134.    Naef Abu Sharkh, a member of the PA's GIS and Director of Civilian Personnel in the West Bank, organized the bombing.  He organized suicide bombings on other occasions, as well.

135.    Based (expressly) on his involvement in this and other terror attacks, the State of Israel seized Abu Sharkh's bank accounts in an operation to confiscate terror funds.

136.    The AAMB, in conspiracy with and materially supported by Defendants, committed, planned, and/or authorized the bombing.  Awada and Abu Sharkh were at all relevant times members of and acting at the behest, instruction, and/or authorization of Defendants and the AAMB.  As of the date of the bombing, the AAMB had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189).

137.    The bombing attack on June 19, 2002 was planned and carried out by Abu Sharkh, Awada and other AAMB members acting as Defendants' agents and employees and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance of Defendants' goals and policies, and using personnel, funds, weapons, means of transportation and communication and other material support and resources that Defendants supplied them for the express purpose of carrying out this attack and terrorist attacks of this type.

138.    Defendants conspired, agreed, and acted in concert with Awada, Abu Sharkh, and the AAMB to carry out the June 19, 2002 terrorist bombing, knowingly provided substantial assistance to them, aided and abetted them to carry out that bombing, and authorized, ratified and participated in that bombing.

**The July 31, 2002 Bombing**

139.    Prior to July 31, 2002, acting pursuant to Defendants' authorization, safe-harbor, solicitation and directives, and within the scope of their agency, Abdullah Barghouti, Ibrahim Hamed, Mohamed Arman, Wael Al-Qassim, Walid Anjas, Mohamed Awda, (collectively hereinafter: the "Hebrew University bombing cell") all jointly planned, agreed, conspired and made preparations to murder and injure innocent persons by means of a bombing attack on the campus of the Hebrew University in Jerusalem, Israel.  The Hebrew University bombing cell members were all members of a terror organization called the Islamic Resistance Movement, also known as Hamas.

140.    Accordingly, on or just prior to July 31, 2002, members of the Hebrew University bombing cell planted a powerful explosive device on the campus of the Hebrew University in Jerusalem.  On the afternoon of July 31, 2002, a member of the Hebrew University bombing cell

detonated the explosive device in the Frank Sinatra cafeteria on the Hebrew University campus, causing a massive explosion.

141.    The explosion killed nine, and wounded 81 others.  Among those murdered in the Hebrew University bombing were American citizens Janis Ruth Coulter, Diane ("Dina") Carter, Benjamin Blutstein and David Gritz, whose deaths were proximately caused by Defendants.

142.    As a direct and proximate result of a result of the July 31, 2002, bombing attack and the murder of Janis Ruth Coulter, Diane ("Dina") Carter, Benjamin Blutstein and David Gritz, Plaintiffs DIANNE COULTER MILLER, ROBERT L. COULTER, JR., ROBERT L. COULTER, SR., DR. LARRY CARTER, SHAUN COFFEL, DR. RICHARD BLUTSTEIN, DR. KATHERINE BAKER, REBEKAH BLUTSTEIN, NEVENKA GRITZ, and NORMAN GRITZ, suffered severe emotional, mental and economic harm and injuries.

143.    Hamas operative Abdullah Barghouti (a.k.a. "the Engineer") manufactured the bomb and delivered it to his Hamas co-conspirators.   Abdullah Barghouti was a notorious terrorist.  He had made a bomb that ripped through a crowded Sbarro restaurant in downtown Jerusalem in August of 2001, killing 15 and wounding 130.

144.    The Israeli government had advance warning and demanded that defendant PA arrest Abdullah Barghouti, but it did not act on that request until the day of the Sbarro bombing, when the bomber was already en route.  Senior PA/PLO officials Jibril Rajoub and Marwan Barghouti, acting within the scope of their employment and agency, made a deal with Hamas leader Ibrahim Hamed that they would arrest Abdullah Barghouti and promptly release him.

145.    Defendants gave Abdullah Barghouti a cell phone while he was in prison after the Sbarro bombing, and he used it to call a Hamas co-conspirator.  Then, less than three weeks after he was jailed, Rajoub, the commander of the PA's Preventive Security Services, and PA Police

Officer Ahmed Barghouti, the bodyguard of Marwan Barghouti, personally released Abdullah Barghouti.

146.    Upon his release, Abdullah Barghouti regained possession of bomb-making materials that defendant PA found when it arrested him.  Abdullah Barghouti immediately rejoined Hamas and resumed his killing spree.

147.    He delivered bombs in November 2001 to Marwan Barghouti and made bombs that Hamas used in terror attacks in December 2001, March 2002, May 2002 (two attacks), June 2002, and July 2002 (two attacks).

148.    Marwan Barghouti and Ahmed Barghouti, acting within the scope of their employment and agency on behalf of Defendants, provided Abdullah Barghouti with money, a gun, and a safe house.

149.    Eventually, Abdullah Barghouti and his co-conspirators were arrested, tried, and convicted.  Abdullah Barghouti pled guilty to committing 66 murders.  At sentencing, he admitted his crimes, saying: "I do not regret any of the acts that I have carried out, and the Court knows that I have taught dozens of engineers to do the work better than me."  Defendants are paying him a generous stipend while he serves his 67 life sentences.  Defendants glorify his heinous crimes even to this day in their media outlets.

150.    The bombing attack on July 31, 2002 was planned and carried out by Abdullah Barghouti, Ibrahim Hamed, Mohamed Arman, Wael Al-Qassim, Walid Anjas, and Mohamed Awda acting as Defendants' agents and within the scope of their agency, pursuant to Defendants' prior authorization, instructions, safe harbor, solicitation and directives, in furtherance of Defendants' goals and policies, and using funds, weapons, means of transportation, safe harbor, communication equipment, and other material support and resources that Defendants supplied

them for the express purpose of carrying out this attack and terrorist attacks of this type.

151.    Hamas, in conspiracy with and supported by Defendants, committed, planned, and/or authorized the bombing.  Abdullah Barghouti, Ibrahim Hamed, Mohamed Arman, Wael Al-Qassim, Walid Anjas, and Mohamed Awda were at all relevant times members of and acting at the behest, instruction, and/or authorization of Hamas.  As of the date of the bombing, Hamas had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

152.    Jibril Rajoub, Marwan Barghouti, and Ahmed Barghouti acted as Defendants' agents and employees and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance of Defendants' goals and policies, provided personnel, funds, weapons, transportation, safe harbor, communication equipment, and other material support and resources for the express purpose of carrying out terrorist attacks of this type.

153.    Defendants conspired, agreed, and acted in concert with Jibril Rajoub, Marwan Barghouti, and Ahmed Barghouti, Hamas, Abdullah Barghouti, Ahmed Barghouti, Ibrahim Hamed, Mohamed Arman, Wael Al-Qassim, Walid Anjas, and Mohamed Awda to carry out the July 31, 2002 terrorist bombing, knowingly provided substantial assistance to them, aided and abetted them to carry out that bombing, and authorized, ratified and participated in that bombing.

**The January 29, 2004 Bombing**

154.    Prior to January 29, 2004, acting pursuant to Defendants' authorization, instructions, solicitation and directives, and within the scope of their agency and employment, Ali Ja'ara, Ahmed Salah, Ali Mohamed Abu Haliel, Abdul Rahman Maqdad, Hilmi Hamash, Mohamed Ma'ali, and Ahmed Sa'ad jointly planned, agreed, conspired and made preparations to

murder and injure innocent persons by means of a bombing attack on a public passenger bus in Jerusalem, Israel.

155.    Accordingly, on January 29, 2004, Ja'ara boarded the Number 19 bus in Jerusalem, in order to murder and injure innocent passengers on the bus by means of a powerful explosive device with which he was provided for this specific purpose by Defendants.  Ja'ara detonated the explosive, causing a massive explosion.

156.    Eleven innocent persons were killed in the explosion, and 45 more were wounded. Among those murdered in the January 29, 2004 bombing was Stuart Scott Goldberg.

157.    As a direct and proximate result of the January 29, 2004 bombing attack and the murder of Stuart Scott Goldberg, Plaintiffs KAREN GOLDBERG, CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG and TZVI YEHOSHUA GOLDBERG suffered severe emotional, mental and economic harm and injuries.

158.    Ja'ara was a member of the PA police and security forces, and was Defendants' employee and agent.

159.    The bombing's mastermind (Abdul Rahman Maqdad) and two others (Ahmed Salah and Hilmi Hamash) were members of the PA police and security forces.

160.    Maqdad was a First Class Sergeant in the PA's National Security Force and was involved in attacks against Israelis as early as 2001.  Maqdad and Salah had earlier held hostages in the Church of the Nativity in Bethlehem.  Defendant PA continued to employ Maqdad as a security officer after his conviction.

161.    Maqdad admitted his crime in open court, and Defendants' own documents state

that he claimed "full and complete responsibility for planning, preparing and executing acts of martyrdom, which were carried out in Jerusalem by the martyr Ali Ja'ara."  Hamash—a Sergeant in the PA police force, despite a criminal record dating back to 1991—was also convicted.

162.    Ja'ara (the bomber) was on defendant PA's payroll at the time of the bombing and his family continued to receive his salary after his death.

163.    Defendants officially designated Ja'ara an "al-Aqsa Martyr," because "[t]he brother was martyred while executing a martyrdom operation in West Jerusalem.  He blew himself up on an Israeli bus carrying passengers."

164.    Defendants awarded Ja'ara's family a monthly stipend, and aired his state funeral—including a military honor guard—on PA TV.  Defendants embraced the other PA employees involved in the bombing, too.

165.    Maqdad continues to receive his salary and has been promoted.

166.    Salah continues to receive his salary and has been promoted at least twice. Defendants' files state that Salah "is loved and appreciated by all."

167.    Defendants continue to pay and promote Hamash.

168.    Three others convicted in the attack—Ali Abu Haliel, Ahmed Sa'ad, and Mohammed Ma'ali—also receive monthly payments from Defendants' Ministry of Prisoners' Affairs.

169.    Ali Yusuf Ja'ara was, at all relevant times, Defendants' employee and agent.

170.    The AAMB, in conspiracy with and materially supported by Defendants, committed, planned, and/or authorized the bombing.  Ali Ja'ara, Ahmed Salah, Ali Mohamed Abu Haliel, Abdul Rahman Maqdad, Hilmi Hamash, Mohamed Ma'ali, and Ahmed Sa'ad were at all relevant times members of and acting at the behest, instruction, and/or authorization of the

33

AAMB.  As of the date of the bombing, the AAMB had been designated as a foreign terrorist

organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

171.    The bombing attack on January 29, 2004, was planned and carried out by Ali

Ja'ara, Ahmed Salah, Ali Mohamed Abu Haliel, Abdul Rahman Maqdad, Hilmi Hamash,

Mohamed Ma'ali, Ahmed Sa'ad and the AAMB acting as Defendants' agents and employees and

within the scope of their agency and employment, pursuant to Defendants' prior authorization,

instructions, solicitation and directives, in furtherance of Defendants' goals and policies, and

using funds, weapons, means of transportation and communication and other material support

and resources that Defendants supplied them for the express purpose of carrying out this attack

and terrorist attacks of this type.

172.    Defendants conspired, agreed, and acted in concert with Ali Ja'ara, Ahmed Salah,

Ali Mohamed Abu Haliel, Abdul Rahman Maqdad, Hilmi Hamash, Mohamed Ma'ali, Ahmed

Sa'ad and the AAMB to carry out the January 29, 2004 terrorist bombing, knowingly provided

substantial assistance to them, and aided and abetted them to carry out that bombing, and

authorized, ratified and participated in that bombing.

## **FIRST COUNT**

### **ACTS OF INTERNATIONAL TERRORISM**
### **(PURSUANT TO 18 U.S.C. §§ 2331 AND 2333(a))**

173.    The preceding paragraphs are incorporated by reference as though fully set forth

herein.

174.    Defendants' acts were dangerous to human life, as evidenced by their nature and

consequences.

175.    Defendants' acts constitute a violation of the criminal laws of the United States

and of the several States, or would constitute criminal violations if committed within the

jurisdiction of the United States or any State.  Defendants actions, if committed within a U.S. jurisdiction, would violate numerous federal and state criminal statutes prohibiting murder, assault, terrorism, use of weapons of mass destruction, material support of terrorism, harboring a terrorist, and financing terrorism, to name a few.

176.    Defendants acted pursuant to, and as implementation of, an established policy of utilizing terrorist attacks to achieve their goals.  Specifically, Defendants' acts appeared intended to terrorize, intimidate and coerce the civilian population in Israel by intimidation or coercion into acquiescing to Defendants' political goals and demands.  These acts also appeared intended to influence the policy of the U.S. and Israeli governments by intimidation or coercion, and to affect the conduct of the U.S. and Israeli governments by mass destruction in order to induce those governments into accepting Defendants' political goals and demands.  Moreover, Defendants, themselves and through their respective officials, representatives, spokesmen, communications media and other agents: (1) repeatedly admitted to committing acts of terrorism and violence against the civilian population in Israel and the West Bank, (2) expressly stated that these acts were intended to intimidate and coerce that civilian population into acquiescing to Defendants' political goals and demands and to influence the policy of the United States and Israeli governments by intimidation or coercion in favor of Defendants' political goals and demands, and (3) expressly threatened the further occurrence of such terrorist acts if their political goals and demands were not achieved.  Some such statements occurred inside the United States.

177.    Defendants' violent acts occurred outside the territorial jurisdiction of the United States.

178.    Thus, Defendants' acts constitute "international terrorism" under § 2331(1).

35

179.    Insofar as alleged above, Plaintiffs are U.S. citizens or estate, survivors, or heirs of U.S. citizens, having an express private right of action under 18 U.S.C. § 2333(a).

180.    Defendants' acts of international terrorism directly and proximately caused the above Plaintiffs' severe injuries, including death, pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.  Thus, Defendants are liable to the above Plaintiffs under § 2333(a).

## SECOND COUNT

### SECONDARY LIABILITY
### FOR ACTS OF INTERNATIONAL TERRORISM
### (PURSUANT TO 18 U.S.C. §§ 2333(d)(2))

181.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

182.    The AAMB or Hamas committed and their operatives, planned, or authorized the acts of international terrorism that caused the above Plaintiffs' injuries.  Namely, the attacks were violent acts and acts dangerous to human life, occurred primarily outside the territorial jurisdiction of the United States, and appeared intended to influence the civilian population in Israel by intimidation or coercion into acquiescing in the shared political goals and demands of the AAMB, Hamas, and Defendants.  These acts also appeared intended to influence the policy of the U.S. and Israeli governments by intimidation or coercion, and to affect the conduct of the U.S. and Israeli governments by mass destruction in order to induce those governments into accepting the shared political goals and demands of the AAMB, Hamas, and Defendants.

183.    The operatives of the AAMB and Hamas involved in these attacks within the scope of their agency and membership, pursuant to the AAMB or Hamas's prior authorization,

instructions, solicitation and directives, in furtherance of their goals and policies.

184.    The United States designated Hamas as a "Foreign Terrorist Organization" under 8 U.S.C. § 1189 on October 8, 1997.  The United States designated the AAMB as a "Foreign Terrorist Organization" under 8 U.S.C. § 1189 on March 27, 2002.

185.    Defendants aided and abetted and/or conspired to commit these acts of international terrorism through the use of funds, weapons, means of transportation and communication, safe harbor, and/or other material support and resources.  They knowingly provided this substantial assistance while being aware—based on information provided to them either through their own information gathering apparatus, or based on information provided to them by other governmental authorities, or through common knowledge at the time—that Hamas, the AAMB and their operatives carried out, and intended to further carry out, acts of international terrorism.

186.    The AAMB and/or Hamas's acts of international terrorism, which Defendants aided and abetted and/or conspired to commit, directly and proximately caused Plaintiffs severe injury, including: death, pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.  Thus, Defendants are liable to the above Plaintiffs under § 2333(d)(2).

187.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages.

## THIRD COUNT

## WRONGFUL DEATH

188.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

189.    Defendants, personally and/or through their agents and/or employees and/or co-conspirators, willfully and deliberately authorized, organized, planned, aided, abetted, induced, conspired to commit, provided material support for and executed the terrorist attacks described above.

190.    Defendants' behavior constituted a breach of duties under the laws of Israel and/or the United States to desist from committing, or aiding, abetting, authorizing, encouraging or conspiring to commit acts of international terrorism and extrajudicial killing, and to refrain from intentionally, wantonly, and/or negligently authorizing or causing the infliction of death, physical injuries and harm to persons such as Plaintiffs herein.

191.    Defendants' actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the terrorist bombing and the deaths of decedents Janis Ruth Coulter, Diane ("Dina") Carter, Benjamin Blutstein, David Gritz and Stuart Scott Goldberg.

192.    At the time of their deaths, decedents Janis Ruth Coulter, Diane ("Dina") Carter, Benjamin Blutstein, David Gritz and Stuart Scott Goldberg enjoyed good health, were industrious and in possession of all their faculties.

193.    The murder of Janis Ruth Coulter, Diane ("Dina") Carter, Benjamin Blutstein, David Gritz and Stuart Scott Goldberg caused decedents, their estates and DIANNE COULTER MILLER, ROBERT L. COULTER, JR., ROBERT L. COULTER, SR., DR. LARRY CARTER, SHAUN COFFEL, DR. RICHARD BLUTSTEIN, DR. KATHERINE BAKER, REBEKAH BLUTSTEIN, NEVENKA GRITZ, NORMAN GRITZ, KAREN GOLDBERG, CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG,

YAAKOV MOSHE GOLDBERG and TZVI YEHOSHUA GOLDBERG severe injury, including: pain and suffering, loss of enjoyment of life, pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.

194.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

195.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public warranting an award of punitive damages.

## FOURTH COUNT

### BATTERY

196.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

197.    The terrorist attacks described herein caused Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN, and OZ JOSEPH GUETTA severe physical and psychological injuries, extreme pain and suffering, and severe financial loss, including deprivation of present and future income.

198.    The terrorist attacks described herein constituted batteries on the persons of Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN, and OZ JOSEPH GUETTA under the laws of Israel and/or the United States.

199.    As a result of the severe injuries inflicted on them by the terrorist attacks described herein, Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN, and OZ JOSEPH GUETTA required hospitalization, surgeries and other medical treatment.

200.    Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN and OZ JOSEPH GUETTA continue to suffer from permanent injuries caused by the terrorist attacks described herein.

201.    Defendants' actions were willful, malicious, intentional, reckless, unlawful, and were the proximate cause of the terrorist attacks described herein and the batteries on the persons of Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN, and OZ JOSEPH GUETTA and the injuries Plaintiffs suffered thereby.

202.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

203.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public warranting an award of punitive damages.

## FIFTH COUNT

### ASSAULT

204.    The preceding paragraphs are incorporated by reference as though fully set forth

herein.

205.    The terrorist attacks described herein and the ensuing carnage caused Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN, VARDA GUETTA, and OZ JOSEPH GUETTA fear and apprehension of harm and death and/or actual physical harm, and constituted assaults on the persons of these Plaintiffs under the laws of Israel and/or the United States.

206.    The terrorist attacks described herein and assaults on their persons, which were direct and proximate results of Defendants' actions, caused Plaintiffs MARK I. SOKOLOW, RENA M. SOKOLOW, JAMIE A. SOKOLOW, LAUREN M. SOKOLOW, SHAYNA GOULD, SHMUEL WALDMAN, DR. ALAN J. BAUER, YEHONATHON BAUER, SHAUL MANDELKORN, VARDA GUETTA, and OZ JOSEPH GUETTA extreme mental anguish and/or actual physical injury and pain and suffering.

207.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

208.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SIXTH COUNT

### NEGLIGENCE

209.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

210.    Defendants, personally and/or through their agents and/or employees and/or co-conspirators, willfully and deliberately and/or wantonly and/or negligently authorized, organized,

planned, provided material support for and executed the terrorist attacks that harmed Plaintiffs.

211.    Defendants had legal duties under the laws of Israel and/or the United States to desist from engaging in, or authorizing and encouraging, acts of violence, and to refrain from deliberately and/or wantonly, and/or negligently authorizing or causing the infliction of injuries to persons such as Plaintiffs herein.

212.    Defendants' behavior constituted a breach of these legal duties.

213.    Defendants foresaw, or should have reasonably foreseen, that their breach of these legal duties would create unreasonable risk of injuries such as those suffered by Plaintiffs to persons such as Plaintiffs.

214.    As a result of Defendants' wrongful and/or unlawful and/or negligent acts, Plaintiffs were caused severe injury, including: death, pain and suffering, pecuniary loss and loss of income, loss of guidance, society and companionship, loss of consortium, severe emotional distress and mental anguish, loss of the enjoyment of life, and loss of solatium.

215.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

216.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## SEVENTH COUNT

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

217.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

218.    Defendants' conduct was willful, outrageous, and was dangerous to human life,

and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency, including the laws of Israel and/or the United States.

219.    Defendants' conduct was intended to and did in fact terrorize Plaintiffs and cause them egregious emotional distress.

220.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

221.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## EIGHTH COUNT

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

222.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

223.    Defendants' conduct was willful, outrageous and/or grossly negligent, and was dangerous to human life, and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency, including the laws of Israel and/or the United States.

224.    Defendants' conduct caused Plaintiffs egregious emotional distress.

225.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

226.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## NINTH COUNT

### SECONDARY LIABILITY
### FOR ALL NON-FEDERAL CLAIMS

227.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

228.    Defendants knowingly and willingly conspired, agreed and acted in concert with each other, with the AAMB and Hamas, and with their agents and employees in a common plan and design to facilitate and cause acts of terrorism including the terrorist attacks in which Plaintiffs were harmed.

229.    Defendants provided one another, and their organs, agencies, instrumentalities, officials, agents and employees, and their other co-conspirators including the Hebrew University bombing cell, with material support and resources and other substantial aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of terrorism including the terrorist attacks in which Plaintiffs were harmed.

230.    As a result of the terrorist attacks caused, resulting from and facilitated by Defendants' provision of material support and resources and other acts of aiding and abetting, Plaintiffs suffered the damages enumerated herein.

231.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

232.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## TENTH COUNT

### VICARIOUS LIABILITY FOR ALL CLAIMS

233.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

234.    At all relevant times, the persons that participated in the above seven attacks were agents and/or officers and/or employees and/or organs and/or agencies and/or instrumentalities of Defendants, and engaged in the actions described herein within the scope of their agency, office and employment and in furtherance of the interests of Defendants.

235.    Defendants authorized and/or ratified these persons' acts.

236.    Therefore, Defendants are vicariously liable for these acts.

237.    Defendants are therefore jointly and severally liable for amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

238.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally, as to each of the above counts and causes of action, as follows:

A.  Compensatory damages against all Defendants, jointly and severally, in an amount to be proved at trial, but no less than $350,000,000.00 (THREE-HUNDRED FIFTY MILLION DOLLARS) before trebling;

B.  Treble damages, costs and attorney's fees as provided in 18 U.S.C. § 2333;

C.  Punitive damages;

D.  Reasonable costs and expenses;

E.  Reasonable attorney's fees; and,

F.  Such further relief as the Court finds just and equitable.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues triable by a jury.

Dated:    New York, New York
          December 26, 2018

ARNOLD & PORTER
KAYE SCHOLER LLP

By: _____
    Kent A. Yalowitz
        *Kent.Yalowitz@arnoldporter.com*
    David Russell
        *David.Russell@arnoldporter.com*
    250 West 55th Street
    New York, NY 10019-9710
    Telephone: 1 212 836 8000
    Fax: 1 212 836 8689

*Attorneys for Plaintiffs*